706 S.E.2d 914

**David L. FOLTZ, Jr., s/k/a David Lee Foltz, Jr.**

v.

**COMMONWEALTH of Virginia.**

**Record No. 0521–09–4.**

Court of Appeals of Virginia,
Richmond.

April 5, 2011.

Beales, J., filed concurring opinion in which Haley, J., joined.
Humphreys, J., filed concurring opinion.

108

Christopher Leibig, Alexandria (Andrea Moseley; Zwerling, Leibig & Moseley, P.C., on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Kenneth T. Cuccinelli, II, Attorney General, on brief), for appellee.

Amicus Curiae: American Civil Liberties Union of Virginia Foundation, Inc. (Rebecca K. Glenberg, Richmond; Thomas Okuda Fitzpatrick (Third Year Practice Certificate), on brief), for appellant.

Present: FELTON, C.J., and ELDER, FRANK, HUMPHREYS, KELSEY, McCLANAHAN, HALEY, PETTY, BEALES, POWELL and ALSTON, JJ.

UPON A REHEARING EN BANC

FELTON, Chief Judge.

David L. Foltz, Jr. ("appellant") was convicted by a jury of abduction with intent to defile pursuant to Code § 18.2–48 and was sentenced to life imprisonment. Before a panel of this Court, appellant contended that the trial court erred by denying his motion to suppress eyewitness testimony of police officers who observed him sexually assault a victim while she walked on a public sidewalk. Specifically, he asserts that evidence was inadmissible because it was obtained as a result of police officers' use of a global positioning system ("GPS") that they placed on his employer's work van to track his movement, without first obtaining a search warrant, in violation of the Fourth Amendment of the United States Constitution and Article I, Section 10, of the Virginia Constitution. In a published opinion, the panel affirmed appellant's conviction. *See Foltz v. Commonwealth,* 57 Va.App. 68, 698 S.E.2d 281 (2010). Pursuant to Code § 17.1–402(D)(ii), we ordered rehearing en banc and stayed the mandate of the panel decision. *See Foltz v. Commonwealth,* 57 Va.App. 163, 699 S.E.2d 522 (2010).

On rehearing en banc, we conclude that the trial court did not err in denying appellant's motion to suppress the eyewitness testimony of the police officers who observed him sexually assault the victim. Accordingly, we affirm appellant's conviction.

## I. BACKGROUND

■ On appeal,

"[w]e consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial. We apply the same standard when, as here, we review the trial court's denial of the defendant's motion to suppress the evidence."

*Perry v. Commonwealth,* 280 Va. 572, 578, 701 S.E.2d 431, 435 (2010) (quoting *Bass v. Commonwealth,* 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000) (citations omitted)).

At the time of his arrest, appellant was a registered sex offender on probation as a result of prior convictions, including rape. Appellant worked for a food services company ("employer"). Employer provided him with a company van to use for work-related purposes in May 2007. Employer limited appellant's use of the assigned van to drive to his home, to the company headquarters, to off-site workplaces and, by special permission, to probation-related appointments after work hours.

A series of sexual assaults bearing similar characteristics occurred in the Northern Virginia region beginning in November 2007. After hearing news reports related to those assaults, retired Fairfax County Police Detective J. Kraut determined that the recent assaults were "amazingly like" the unique *modus operandi* used in offenses he had investigated in the late 1980s, although he could not recall the name of the individual who was investigated in the earlier offenses.

In January 2008, Kraut contacted Lieutenant Akre of the Fairfax County Police Department's sex crimes unit and told her about his investigation of the earlier offenses.[1] At the time Kraut contacted her, Lt. Akre already had identified appellant as a suspect in the recent sexual assaults.[2]

The investigating officers obtained appellant's work schedule and his schedule for probation-related meetings. They compared those schedules with the times and locations of the recent sexual assaults. The officers determined that the recent assaults occurred in the general area where appellant worked

---

1. When Lt. Akre related the substance of Kraut's call to a senior Fairfax County detective, the senior detective immediately knew Kraut was referring to appellant.

2. Police files revealed that the offenses involving appellant in the 1986–1990 timeframe shared similar characteristics with the recently reported offenses and that after appellant was arrested in 1990, he had confessed to committing six sexual offenses, including a rape in 1986.

and attended meetings and that the times and locations of those assaults were consistent with his presence for work and meetings in the same areas. From the information that they had collected, the officers focused on appellant as a strong suspect in the recent assaults.

Thereafter, on February 1, 2008, the officers attached a GPS system to the bumper of appellant's assigned work van while it was parked on the public street in front of his residence. They did not obtain a search warrant prior to doing so nor did they obtain employer's permission. The officers first examined data from the GPS tracking system on the afternoon of February 5, 2008, four days after they placed the device on the van. From that data, they observed that the van had been driven in and out of various neighborhoods where the recent sexual assaults had occurred. The pattern of the van's movements concerned the officers, who characterized the pattern as "hunting" behavior.

On the evening of that same day, February 5, 2008, another sexual assault occurred in the region. The investigating officers checked the GPS log and discovered that appellant's assigned work van was parked about a block or two away from the scene of that assault at the time it occurred. With that additional information, the officers determined it was critical to personally follow appellant as he moved around.

On the following day, officers visually followed appellant as he drove his personal truck.[3] They observed him park his truck, get out, and put on a jacket and gloves. Two police officers then followed appellant on foot. They observed him, with "something up over his face," run after a woman who was walking down a public sidewalk. The officers testified that they saw appellant grab the woman from behind and knock her to the ground. They then saw appellant pull his victim under a tree, pin her down, and try to unbutton her pants.

---

**3.** The surveillance team consisted of 18 police officers in 10 unmarked vehicles.

The officers quickly intervened, stopped the assault, and apprehended appellant.

Prior to trial, appellant moved to suppress all evidence collected by the police flowing from their use of the GPS device to track the movement of his assigned work van. He argued that the police were required to obtain a search warrant prior to attaching the GPS device to the van, and to use that device to track his movements. He contended that the officers' failure to obtain a search warrant prior to attaching the GPS device required that any evidence obtained through the use of that device, including the testimony of the officers who observed him attack the victim, be suppressed under the exclusionary rule. The trial court denied appellant's motion to suppress. It found that prior to placing the GPS device on employer's van assigned to appellant, the investigating officers had already focused on appellant as the prime suspect in the recent sexual assaults on women in the region. Regarding the use of the GPS device, the trial court stated, "all it did was technologically supplement that information which the police could have obtained by their own sensory perception by actually trailing him or following him for a period of time, which they ultimately did in making the arrest in this case."

Following his conviction, appellant petitioned this Court for an appeal. His petition for appeal contained twelve questions presented.[4] By per curiam order dated September 29, 2009, we denied nine of the questions presented, and granted the following three questions:

I. Whether the trial court erred by ruling that the warrantless, Global Positioning System (GPS) tracking of Mr. Foltz did not violate the Fourth Amendment or Article [I], Section 10 of the Virginia Constitution where the tracking was done without probable cause, without real-time police monitoring, without attempts not to track in private areas,

---

4. This appeal is governed by Rule 5A:20(c) as worded prior to its revision effective July 1, 2010, changing the requirement from setting forth "questions presented" to setting forth "assignments of error."

and where Mr. Foltz was tracked on private property not visible to the public.

II. Whether the trial court erred by ruling that the police's act of physically placing of a GPS device inside the bumper of a van controlled by Mr. Foltz violated the Fourth Amendment and Article [I], Section 10 of the Virginia Constitution.

III. Whether the trial court abused its discretion by denying Mr. Foltz the right to discover the precise make and model of the GPS system used by police to track him while refusing admission of Mr. Foltz's out-of-court GPS experiment on the grounds that Mr. Foltz failed to demonstrate that the GPS device used in the experiment was sufficiently similar to the police system.

Following the decision of a panel of this Court affirming appellant's conviction, we ordered rehearing en banc on the issues addressed by the panel in its opinion.[5]

## II. ANALYSIS

■ "In this case, as in all others, we seek to decide cases, 'on the best and narrowest ground available' from the record." *Kirby v. Commonwealth,* 50 Va.App. 691, 698 n. 2, 653 S.E.2d 600, 603 n. 2 (2007) (quoting *Miles v. Commonwealth,* 274 Va. 1, 2, 645 S.E.2d 924, 925 (2007) (Kinser, J., concurring) (citations omitted)). This approach encourages " 'judicial self-restraint' " by avoiding the resolution of broad, reasonably debatable legal issues when narrower, less debatable legal issues fully dispose of the appeal before the court. *Cooper v. Commonwealth,* 54 Va.App. 558, 566, 680 S.E.2d 361, 365 (2009) (quoting *Craddock v. Commonwealth,* 40 Va.App. 539, 551 n. 1, 580 S.E.2d 454, 461 n. 1 (2003)).

■ On appeal, appellant argues that the eyewitness testimony of the police officers who observed him attack the victim must be excluded from evidence as "fruit of the poisonous

---

5. Pursuant to Rule 5A:20(e) we do not address appellant's question presented III because appellant did not address that question presented in his brief to the en banc Court.

tree" from the unlawful use of a GPS tracking device. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

From our review of the record on appeal, we conclude that the trial court did not err in denying appellant's motion to suppress the eyewitness testimony of the police officers. We reach this conclusion without addressing whether the use of the GPS device, attached to employer's van assigned to appellant, without first obtaining a search warrant, violated appellant's rights under the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Virginia Constitution.[6]

The record on appeal clearly demonstrates that the officers' investigation of recent unsolved sexual assaults in the region pointed to appellant as the likely perpetrator of those assaults, based on the perpetrator's unique *modus operandi* in those assaults and the locations where those assaults occurred. Prior to placing the GPS device on the van, the investigating officers acquired significant and reliable information that led them to focus on appellant, a registered sexual offender on probation, as the prime suspect in the recent sexual assaults. The record also reflects that prior to use of the GPS device, the investigating officers compared the *modus operandi* appellant used in the previous sexual assaults with the *modus operandi* used by the perpetrator of the recent unsolved sexual assaults in the region. Additionally, the recent assaults

---

6. At oral argument, the parties agreed that the basis for our decision today was not raised to the trial court. However, we conclude, for the reasons stated herein, that the trial court's decision to deny appellant's motion to exclude the officers' eyewitness testimony of appellant's attack on his victim was the correct decision.

"Failure to make the argument before the trial court is not the proper focus of the right result for the wrong reason doctrine. Consideration of the facts in the record and whether additional factual presentation is necessary to resolve the newly-advanced reason is the proper focus of the application of the doctrine."

*Banks v. Commonwealth,* 280 Va. 612, 617, 701 S.E.2d 437, 440 (2010) (quoting *Perry,* 280 Va. at 580, 701 S.E.2d at 436).

occurred in the area where appellant lived and worked, and where he attended probation-related meetings. Based on that information, and the report of a sexual assault occurring the previous night in an area where GPS records indicated appellant's assigned work van had been parked nearby, the officers concluded that appellant was likely the perpetrator of the sexual assaults and that he was likely to attack again. Based on those factors, the officers decided to visually follow appellant's movements the following day.

During their visual surveillance of appellant, the officers witnessed his sexual assault on the victim. The officers were not engaged in any unlawful conduct whatsoever when they conducted a visual surveillance of appellant as he traveled in his personal truck over public roads. When they saw appellant sexually assault the victim, they quickly intervened, rescued the victim, and apprehended him.[7]

 The officers' eyewitness testimony was material, competent, and relevant to prove that appellant was guilty of abduction with intent to defile.

> "As a general rule, a litigant is entitled to introduce all competent, material, and relevant evidence tending to prove or disprove any material issue raised, unless the evidence violates a specific rule of admissibility." "Evidence is admissible if it is both relevant and material," and it is inadmissible if it fails to satisfy either of these criteria. "Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case." "Evidence is material if it relates to a matter *properly* at issue."

*Calhoun v. Commonwealth,* 35 Va.App. 506, 509, 546 S.E.2d 239, 241 (2001) (quoting *Peeples v. Commonwealth,* 28 Va.App. 360, 365, 504 S.E.2d 870, 873 (1998) (citations omitted)).

---

**7.** Police "officers may arrest, without a warrant, any person who commits any crime in the presence of the officer...." Code § 19.2–81(B).

However, appellant asserts that, because information obtained from the GPS device was a factor in the police officers' decision to personally follow him, any unlawful acts they observed him commit in their presence must be excluded as "fruit of the poisonous tree." We disagree.

Whether evidence should be excluded as derivative of an illegal act and, therefore, suppressed under the exclusionary rule as "fruit of the poisonous tree" of that act, depends on whether " 'the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417 (quoting John M. Maguire, *Evidence of Guilt* 221 (1959)), quoted with approval in *Hudson v. Michigan,* 547 U.S. 586, 592, 126 S.Ct. 2159, 2164, 165 L.Ed.2d 56 (2006). The United States Supreme Court has observed that evidence is not " 'fruit of the poisonous tree' simply because it would not have come to light *but for* the illegal actions of the police." *Id.* (emphasis added). *See Hudson,* 547 U.S. at 592, 126 S.Ct. at 2164 (observing that "but-for causality is only a necessary, not a sufficient, condition for suppression"). The exclusion of evidence " 'has always been our last resort, not our first impulse,' and our precedents establish important principles that constrain application of the exclusionary rule." *Herring v. United States,* 555 U.S. 135, 140, 129 S.Ct. 695, 700, 172 L.Ed.2d 496 (2009) (quoting *Hudson,* 547 U.S. at 591, 126 S.Ct. at 2163). Evidence is obtained by means sufficiently distinguishable to be admissible despite an illegality by the authorities if it is "evidence attributed to an independent source" or "evidence where the connection has become so attenuated as to dissipate the taint." *Warlick v. Commonwealth,* 215 Va. 263, 266, 208 S.E.2d 746, 748 (1974).

Here, we hold that the exclusionary rule does not bar the eyewitness testimony of the officers who witnessed appellant sexually assault the victim. The assault the officers observed was a new and distinct offense from the previously committed crimes the officers were investigating, and sufficiently inde-

pendent of any information obtained by them from the GPS tracking device.[8] The officers' focus on appellant, a registered sex offender on probation, as the likely perpetrator of the recent sexual assaults did not begin with the placement of the GPS device on his assigned work van. They knew that appellant resided, worked, and attended probation-related meetings where the recent assaults occurred. They knew that the manner in which the perpetrator of the recent sexual assaults attacked those victims was "amazingly like" that appellant used in previous sexual assaults to which he had previously confessed. The additional information obtained from the GPS tracking of the van's locations near the scene of the latest attack was just one more piece of information to add to the already strong focus on appellant as the person responsible for the assaults. The officers' immediate concern for public safety and the urgency of apprehending the predatory sexual attacker resulted in their decision to visually follow appellant as he drove his personal vehicle along the public streets the day following the most recent sexual assault in that area. The officers' testimony, which appellant sought to suppress, related to events they observed as they saw appellant assault the innocent victim as she walked along a public sidewalk.

We hold that the officers' observations of that criminal act were sufficiently attenuated from any argued taint arising from the placement and use of the GPS device to track the movements of appellant's assigned work van and that there is no basis in law to exclude the officers' eyewitness testimony of a violent assault being committed in their presence.

---

8. *Cf. United States v. Sprinkle,* 106 F.3d 613 (4th Cir.1997) (affirming conviction for new, distinct crime committed by suspect's response to an illegal stop); *Testa v. Commonwealth,* 55 Va.App. 275, 685 S.E.2d 213 (2009) (applying *Sprinkle* to affirm conviction of obstruction of justice for threatening police officer committed during allegedly unlawful entry); *Brown v. City of Danville,* 44 Va.App. 586, 606 S.E.2d 523 (2004) (affirming conviction where appellant engaged in a new and distinct criminal act in response to unlawful police conduct).

## III. CONCLUSION

For the reasons stated herein, we hold that the trial court did not err in denying appellant's motion to suppress the eyewitness testimony of the police officers. Accordingly, we affirm the judgment of the trial court.

*Affirmed.*

BEALES, J., with whom HALEY, J., joins, concurring.

While I agree that this Court should affirm appellant's conviction, I believe that the best and narrowest ground for resolving this appeal is to address the Fourth Amendment issue that was presented to the trial court and to this Court on appeal. This Fourth Amendment issue was extensively briefed and argued by the parties in the trial court, and it was the issue that the trial court actually addressed in denying appellant's motion to suppress. Furthermore, this same Fourth Amendment issue was the issue presented to this Court in appellant's petition for appeal, and it was the subject of the questions presented granted by this Court.[9] On appellate review in this Court, it is clear that no Fourth Amendment violation occurred under the particular facts of this case (and no one has ever argued that any Virginia statute was violated here either).[10] Accordingly, I would squarely address

---

9. Appellant raised two related issues before this Court, which were the same issues he raised at trial—whether his Fourth Amendment rights were violated by putting a GPS device in the bumper of his work van or by using a GPS device to track his movements in the work van. This Court granted appellant's petition for appeal on these issues. By basing our ruling on the Fourth Amendment, we would be affirming the trial court on the same grounds on which the trial court itself based its denial of appellant's motion to suppress.

10. Appellant never argues that there is any Virginia statute requiring that a warrant be issued before a GPS device may be placed in the bumper of his work van. The only question on appeal before this Court in this case is whether the Fourth Amendment prohibits the use of a GPS device on a person's work vehicle (which is owned by the person's employer) when there is reasonable, articulable suspicion that this person has committed or is about to commit a crime—or, as here, a continuing series of crimes.

the Fourth Amendment issue that is before this Court in this case, and I would affirm the trial court on this Fourth Amendment basis as argued by the parties—not on an alternative basis.

## I. BEST AND NARROWEST GROUND FOR AFFIRMING

If this Court is confronted with more than one reason to affirm a trial court's decision, then we should, of course, affirm that decision on the best and narrowest ground available from the record. *Podracky v. Commonwealth*, 52 Va.App. 130, 134, 662 S.E.2d 81, 84 (2008). Thus, in appropriate cases, appellate courts can and should affirm a trial court's ruling on a different basis than the basis used by the trial court—provided that this alternative ground is the *best* and narrowest one for affirming the trial court's decision.

In some cases, such as the case today before this Court, the best and narrowest ground for affirming the denial of a suppression motion is to hold that the trial court simply did not err in its ruling on the substantive constitutional issue. It is not necessary, on appeal in such a case, to avoid addressing the substantive constitutional issue altogether and instead reach the conclusion that the exclusionary rule is inapplicable. *See, e.g., United States v. Pineda–Chinchilla*, 712 F.2d 942, 944 (5th Cir.1983). No controlling authority holds or even suggests that this Court *must* consider the exclusionary rule when seeking to determine the best and narrowest ground for affirmance—especially when it is clear that the trial court's ruling on the substantive constitutional issue was not erroneous. *See Armstead v. Commonwealth*, 56 Va.App. 569, 576, 695 S.E.2d 561, 564 (2010) ("We do not address the exclusionary rule issue because 'the best and narrowest ground available' for decision is the first premise of Armstead's argument—that the trial court's decision is inconsistent with [*Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009)]. We do not believe it is." (footnotes and citation omitted)).[11]

---

11. Like the majority, I do not tend to believe that the testimony of the police officers describing appellant's actions on February 6, 2008,

Here, "the best and narrowest ground," *id.*, for resolving this appeal is to address the Fourth Amendment issue that was actually presented to the trial court and that was presented to this Court on appeal. The Fourth Amendment principles pertinent to this case are well established. The trial court based its ruling on these Fourth Amendment principles. The questions presented raised by appellant and granted by this Court were based on these Fourth Amendment principles. Addressing these Fourth Amendment principles on appellate review, it is clear that appellant's Fourth Amendment rights were not violated, given the facts in this particular case. Therefore, in this case, it is certainly appropriate to apply these well-established Fourth Amendment principles to the very specific factual situation presented here.

## II. FOURTH AMENDMENT ANALYSIS

I certainly acknowledge up front that there are some very legitimate concerns arising from the development and use of sophisticated technology such as GPS devices. *See, e.g., United States v. Knotts*, 460 U.S. 276, 284, 103 S.Ct. 1081, 1086, 75 L.Ed.2d 55 (1983); *United States v. Maynard*, 615 F.3d 544, 565 (D.C.Cir.2010); *United States v. Garcia*, 474 F.3d 994, 998 (7th Cir.2007). The government *could* potentially abuse this technology in an Orwellian manner by truly invading the

---

which appellant sought to suppress as fruit of the poisonous tree, is subject to the exclusionary rule. However, an appellate court need not actually address the exclusionary rule on appeal, if the better and narrower ground for affirmance is to address the substantive Fourth Amendment issue. *See Armstead*, 56 Va.App. at 576, 695 S.E.2d at 564. In addition, a significant function of an appellate court is to "to provide guidance to trial courts" on substantive legal issues, unless doing so would result in an advisory opinion. *See Angel v. Commonwealth*, 281 Va. 248, 273 n. 6, 704 S.E.2d 386, 401 n. 6 (2011) (internal quotation marks omitted); *see also United States v. Cruz*, 581 F.2d 535, 541 (5th Cir.1978) (en banc) ("The dual function of appellate courts is to review the record of trials for alleged error and, incident thereto, to announce and apply principled rules for the guidance of trial courts, lawyers, and litigants."), *overruled on other grounds by United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir.1987). Here, applying the Fourth Amendment principles considered by the trial court to the facts of this case certainly would not be providing an advisory opinion.

private lives of individuals without any constitutional justification.

Although I certainly share these concerns about the potential use of Orwellian practices by the state that would abuse the privacy rights of the citizenry, the particular facts of *this specific case* simply do not even raise such concerns. *See Dow Chemical Co. v. United States,* 476 U.S. 227, 239 n. 5, 106 S.Ct. 1819, 1827 n. 5, 90 L.Ed.2d 226 (1986) ("Fourth Amendment cases must be decided on the facts of each case," not based on generalizations.). As Judge Posner wrote on behalf of the Seventh Circuit in *Garcia, affirming* the use of GPS tracking in that case, "[w]hether and what kind of restrictions should, in the name of the Constitution, be placed on such surveillance when used in routine criminal enforcement are momentous issues that fortunately we need not try to resolve in this case." 474 F.3d at 998. Similarly, this Court need not tackle such "momentous issues" in this case. Here, given the specific facts of this case, *this appellant's* Fourth Amendment rights clearly were not violated.

"The Fourth Amendment of the United States Constitution provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Gibson v. Commonwealth,* 50 Va.App. 744, 749, 653 S.E.2d 626, 628 (2007) (quoting U.S. Const. amend. IV). Thus, "[t]he Fourth Amendment protects the privacy and security of individuals against arbitrary searches and seizures by governmental officials." *Harris v. Commonwealth,* 276 Va. 689, 694, 668 S.E.2d 141, 144 (2008) (citing *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967); *Brown v. Commonwealth,* 270 Va. 414, 418, 620 S.E.2d 760, 762 (2005)). "The key inquiry regarding whether the [Fourth] Amendment affords protection is 'whether a person has a constitutionally protected reasonable expectation of privacy.'" *Gibson,* 50 Va.App. at 749, 653 S.E.2d at 628 (quoting *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984)); *see United States v. Knights,* 534 U.S. 112, 118, 122 S.Ct. 587, 591, 151 L.Ed.2d 497 (2001) (noting

that "[t]he touchstone of the Fourth Amendment is reasonableness"). The United States Supreme Court has made it clear that a constitutionally protected reasonable expectation of privacy exists under the Fourth Amendment *only* if a person has a subjective expectation of privacy *and* if society recognizes that subjective expectation of privacy as reasonable. *Kyllo v. United States*, 533 U.S. 27, 33, 121 S.Ct. 2038, 2042–43, 150 L.Ed.2d 94 (2001); *Oliver*, 466 U.S. at 177, 104 S.Ct. at 1740–41.

"[T]he Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).[12] This case does not concern a search and seizure of appellant's person, or the recording of any of appellant's private conversations. This case does not involve appellant's home *or even appellant's own property*. Especially as this case concerns a van owned and regulated by appellant's employer, the circumstances in this case certainly did not violate appellant's own privacy protections under the Fourth Amendment.

## A. Placement of GPS Device

In this case, the police installed a GPS device in the bumper of a van that was owned by appellant's *employer*—it is undisputed that the van was not appellant's own vehicle. Appellant used this work van with his employer's consent, and the employer allowed him to use it *only* for work and to travel to appointments with his probation officer when time would not permit him to go home first and use his own vehicle. In short, appellant's employer clearly regulated the use of this work van, and it forbade him from using the van for almost all personal activities.

---

**12.** Although the actual text (as opposed to the footnote) of Judge Humphreys's concurrence appears to suggest that the United States Supreme Court should overturn (or significantly alter) decades of Fourth Amendment precedent from that Court, other federal appellate courts, and the Virginia Supreme Court, the parties here agree that the United States Supreme Court's decisions in *Katz* and its progeny are the controlling cases on the Fourth Amendment issues raised in this appeal.

Furthermore, the employer's van used by appellant in this case was parked on a public street when the police attached the GPS device to the van. The device was placed in the bumper of the van; thus, attaching the device did not require opening the van's passenger compartment or accessing its battery power. Given these circumstances (and for the reasons that follow), no Fourth Amendment violation resulted from the placement of the GPS device on the employer's van in this manner.

The placement of the GPS device in the bumper of appellant's employer's van is similar in some ways to the situation addressed by the United States Supreme Court in *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). In *Karo*, tracking devices were placed in containers that were then purchased by Karo, who in turn placed the containers in his vehicle. *Id.* at 707, 104 S.Ct. at 3299. The Supreme Court found that the transfer to Karo of the containers with the hidden tracking devices did not infringe on his privacy, explaining:

> [The transfer] conveyed no information that Karo wished to keep private, for it conveyed no information at all. To be sure, it created a potential for an invasion of privacy, but *we have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment.*

*Id.* at 712, 104 S.Ct. at 3302 (emphasis added). Similarly, in this case, the installation of the GPS device in the bumper of appellant's employer's van did not relay *any* information—private or otherwise, from appellant or from anyone else—to the police. Therefore, the police did not infringe appellant's privacy by installing the device in the work van because nothing private was actually exposed by the placement.

In addition, placing the GPS device in the bumper of his employer's van, while that van was parked on a public street, did not expose anything that was not already visible and freely accessible to the public. *See United States v. Pineda–Moreno*, 591 F.3d 1212, 1215 ("If a neighborhood child had walked

up Pineda–Moreno's driveway and crawled under his Jeep to retrieve a lost ball or runaway cat, Pineda–Moreno would have no grounds to complain."), *reh'g en banc denied,* 617 F.3d 1120 (9th Cir.2010); *United States v. McIver,* 186 F.3d 1119, 1127 (9th Cir.1999) (finding McIver did not prove that "he intended to preserve the undercarriage" of the vehicle "from inspection by others" and that "the officers did not pry into a hidden or enclosed area" when they installed a GPS device on the vehicle); *United States v. Rascon–Ortiz,* 994 F.2d 749, 754–55 (10th Cir.1993) (finding that the agent did not violate a defendant's privacy when he examined the undercarriage of a vehicle because "[t]he undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy" and because the agent did not "disturb[ ] or move[ ] parts of the car in order to facilitate his observations").[13]

The United States Supreme Court has noted that "[t]he public is fully aware that it is accorded less privacy in its automobiles" because there is a "compelling governmental need" to regulate motor vehicles. *California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 2070, 85 L.Ed.2d 406 (1985). Accordingly, "warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not." *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). This case presents even less of a privacy interest than the situations addressed by the Supreme Court in *Carney* and *Opperman.* Here, the GPS device was placed inside the *bumper* of the work van that appellant's employer allowed him to drive—not inside the passenger compartment or in the glove compartment, where personal articles are often kept. The bumper of appellant's employer's van, parked on a public street, certainly does not "provide the setting for those intimate activities that

---

**13.** The fact that the police had to touch the work van to install the GPS does not mean that the installation violated a reasonable expectation of privacy in some way. *See Cardwell v. Lewis,* 417 U.S. 583, 591, 94 S.Ct. 2464, 2468–70, 41 L.Ed.2d 325 (1974) (finding that a defendant's privacy rights were not violated when the police examined a tire and took a paint sample from his car as it was in a public parking lot).

the [Fourth] Amendment is intended to shelter from government interference or surveillance." *Oliver*, 466 U.S. at 179, 104 S.Ct. at 1741.

Based on the specific facts in this case, the police did not violate appellant's reasonable expectation of privacy when they installed the GPS device in the bumper of his employer's work van. The employer's van was not appellant's personal property, and it was not parked on his property. Although appellant drove the van, he was not in control of where the van was supposed to go. Instead, appellant's employer told him where he could drive the van. Thus, the employer strictly controlled the van's movements and directed appellant where he was supposed to be going with it.

Furthermore, appellant did nothing to remove his employer's van from the public's view—it was parked on the street without a cover, and nothing prevented the public from observing the van. In fact, appellant's employer clearly *wanted* the public to notice this van—the business' logo and contact information were publicized on the side of the van, obviously intending to attract attention.

Moreover, the installation of the GPS device did not require that the police open the doors or the hood of the employer's van, and the police did not connect the device to any operational part of the vehicle. *Compare Karo*, 468 U.S. at 707, 104 S.Ct. at 3299 (finding "no Fourth Amendment interest of Karo or of any other respondent was infringed by the installation of the beeper" which merely occupied space in a can purchased by Karo) *with Commonwealth v. Connolly*, 454 Mass. 808, 913 N.E.2d 356, 361–62, 369 (2009) (finding that installation of a GPS device *by attaching it to the car's battery* violated the Massachusetts Declaration of Rights). Instead, the GPS device used its own power source. *See Garcia*, 474 F.3d at 997. No evidence suggested that the device affected the performance of the employer's van or impeded in any way appellant's ability to use the van for his job.

Given all of these circumstances, I would find that the installation of the GPS device in this particular case did not violate appellant's Fourth Amendment rights.

## B. GPS Tracking

I would also find that appellant's Fourth Amendment privacy rights were not violated when the police used the GPS device to track appellant's movements while appellant was driving on the public streets [14] in his employer's van, especially given his movements in the van were already regulated by the employer, as the van's owner.

The United States Supreme Court has repeatedly held that society does not recognize an expectation of privacy in the movement of vehicles on public streets. *Knotts*, 460 U.S. at 281, 103 S.Ct. at 1085 ("A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."); *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974) ("A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view."); *see also Carney*, 471 U.S. at 392, 105 S.Ct. at 2069–70 ("The public is fully aware that it is accorded less privacy in its automobiles. . . ."); *Rakas v. Illinois*, 439 U.S. 128, 148, 99 S.Ct. 421, 432–33, 58 L.Ed.2d 387 (1978) ("We have on numerous occasions pointed out that cars are not to be treated identically with houses or apartments for Fourth Amendment purposes."). Here, appellant drove his employer's work van on public streets.

---

14. Appellant also claims that his Fourth Amendment rights were violated when the police tracked the van to his employer's place of business, which was in a business park marked "private" property. However, as the trial court found, appellant presented no evidence that *appellant* had any expectation of privacy at his employer's warehouse—especially regarding the movement of the van, which his employer owned. The police did not track the employer's van onto any property owned by appellant or to any other private place where appellant would have a reasonable expectation of privacy. As a result, I agree with the trial court that *appellant's* privacy rights were not violated when the GPS device tracked the employer's van to the employer's warehouse. *See Katz*, 389 U.S. at 351, 88 S.Ct. at 511.

Given the limited expectation of privacy in a vehicle's movement on public roads, the particular facts here make it very clear that the use of GPS tracking *in this case* did not violate appellant's privacy rights. First, in this case, the police used the GPS device to track appellant's movements as he drove his employer's work van—not as he drove his own vehicle. The movements of this van were already being "tracked" by its owner, appellant's employer, who regulated appellant's use of its work van. Therefore, this case is unlike *Maynard*, 615 F.3d at 555, where the police tracked the defendant's unrestricted driving of his personal vehicle for a number of weeks. This case is also unlike *Connolly*, 454 Mass. at 810, 913 N.E.2d at 361, and *State v. Weaver*, 12 N.Y.3d 433, 882 N.Y.S.2d 357, 909 N.E.2d 1195, 1195 (2009),[15] where the police tracked the personal vehicles of the suspects. In those three cases, unlike here, no one regulated the defendants' use of their vehicles.

Here, on the other hand, appellant's employer limited appellant's use of the work van. Appellant did not have permission to drive the van wherever he liked or to do whatever he wanted with it. He could not sell it or rent it to other people. He could not drive it for personal errands. As the prosecutor noted in the trial court, appellant was not even permitted to use his employer's van "to stop on the way home from work for grocery shopping." Appellant was only allowed to drive the van to the places where his employer told him to take it and to pre-approved probation meetings. Therefore, appel-

---

**15.** Both the Massachusetts and the New York courts have found that GPS tracking specifically violated their state constitutions, not necessarily the federal constitution. *See Connolly*, 454 Mass. at 808, 913 N.E.2d at 369; *Weaver*, 882 N.Y.S.2d 357, 909 N.E.2d at 1201–03. The privacy rights afforded by the Massachusetts and New York state constitutions are broader than those afforded under the federal constitution. *Commonwealth v. Balicki*, 436 Mass. 1, 762 N.E.2d 290, 299 n. 11 (2002); *Weaver*, 882 N.Y.S.2d 357, 909 N.E.2d at 1202. In Virginia, on the other hand, Article I, Section 10, of our state constitution is simply coextensive with the Fourth Amendment of the United States Constitution. *Lowe v. Commonwealth*, 230 Va. 346, 348, 337 S.E.2d 273, 274 (1985) (citing A. Howard, I *Commentaries on the Constitution of Virginia* 182 (1974)).

lant's movements with the work van were already essentially "under surveillance" by his employer.

Indeed, this case concerns *only* appellant's movements *while he drove his employer's work van.* As the trial court found, the police "didn't put the device *on him;* they put it on [the employer's] van." (Emphasis added). This situation is simply very different than the situation in *Maynard.* In that case, over the course of a month, the authorities tracked *all* of that defendant's unregulated and otherwise unmonitored movements *in his own vehicle. Maynard,* 615 F.3d at 558. In this case, over a much shorter period of time, GPS tracking was *only* used to track appellant's movements in his employer's van—and appellant could not have had a reasonable expectation of privacy in his movements in his employer's van because he understood that his movements in this van were *already supposed* to be regulated by and revealed to his employer. *See Smith v. Maryland,* 442 U.S. 735, 743–44, 99 S.Ct. 2577, 2581–82, 61 L.Ed.2d 220 (1979) ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.").

In addition, the employer's van in this case was *designed* to attract attention, unlike the personal vehicles in *Maynard,* 615 F.3d at 555, *Connolly,* 454 Mass. at 810, 913 N.E.2d at 361, and *Weaver,* 882 N.Y.S.2d 357, 909 N.E.2d at 1195.[16] In those cases, the vehicles were typical cars or vans—private vehicles

---

16. Moreover, the *manner* in which appellant drove his employer's van certainly attracted attention. Tracking the movements of the employer's van using GPS technology, police officers observed (in real time) how the employer's van was being driven in and out of various neighborhoods on the afternoon of February 5, 2008. This pattern of driving concerned the officers, who characterized the pattern as "hunting" behavior. Detective Kirk, one of the detectives who observed the GPS data, testified, "What I was observing was the vehicle driving on the same streets, driving at a slow rate of speed. That concerned me from my experience of working sex-crimes cases. It is often a pattern that is shown by sex offenders, rapists." "[W]hoever is driving that vehicle should be looked at," Detective Kirk recalled saying at that time, and the other officers assigned to the case agreed with his suggestion. That night, another sexual assault occurred—and the GPS data indicated that the employer's van was parked within two blocks of

belonging to the suspects being tracked. Here, the vehicle was a commercial van owned by appellant's employer. The employer had placed its logo and business information on the side of the van—essentially advertising the business as appellant drove the employer's work van on the streets and parked it in public places. Clearly, appellant's employer *wanted* people to notice the van's movements. Appellant, as the driver of the van and an employee, knew that this conspicuous advertising had been placed on the work van.

Appellant simply cannot claim that he has a privacy expectation in the movements of his employer's van as it moves on the public streets. Both the appearance of the van and his employer's control of the van establish that appellant's movements with the van were already exposed while he drove it on the public streets and were certainly not kept private. Moreover, the police in this case were investigating a continuing series of sexual assaults, and appellant does not now contest the trial court's finding that the police had reasonable, articulable suspicion to consider him a suspect in these offenses. The police used the GPS device to crack this case by tracking appellant on the public roadways—which they could, of course, do in person any day of the week at any hour without obtaining a warrant—and the police tracked appellant's movements with the GPS device *only while he drove his employer's vehicle.* Under these circumstances, the use of GPS tracking in this case was certainly not arbitrary—and was not unconstitutional. *See Knights,* 534 U.S. at 118, 122 S.Ct. at 590–91; *Camara,* 387 U.S. at 528, 87 S.Ct. at 1730–31.

Consequently, the use of GPS tracking *in this case* did not violate appellant's Fourth Amendment rights.

### III. CONCLUSION

In my view, the best and narrowest ground for deciding this case is to hold that the trial court did not err in denying

the scene of the attack at the time it occurred. The police then began following appellant themselves on February 6, 2008—the next day.

appellant's motion to suppress because the installation and use of the GPS device here simply did not violate the Fourth Amendment.

I recognize the potential for abuses of GPS technology by the government, but a multitude of circumstances *in this case* establish that appellant's privacy rights simply were not violated:

- the fact that the van was owned by appellant's employer—not appellant himself [17];

- the fact that the employer told appellant where to drive its van and otherwise regulated his use of the van;

- the fact that the van was intended by its owner to be seen—as a conspicuous form of advertising for appellant's employer—as it was being driven on the public streets;

- the fact—not even contested on appeal—that the police had reasonable, articulable suspicion that appellant had recently committed a series of sexual assaults (similar to crimes for which he had been previously convicted) and that he was continuing to assault women;

- the fact that the employer's van was parked on a public street when the GPS device was installed;

- the fact that the GPS device was not connected to the employer's van's mechanical workings, such as its battery;

- the fact that the device was placed in the employer's van's bumper—not inside its passenger compartment; and

- the fact that the employer's van's movements were tracked while it was being driven on the public streets, where the police could, of course, have followed appellant in person at any time without obtaining a warrant.

Given all of these circumstances, which certainly do not establish any kind of arbitrary "intrus[ion] upon an individual's privacy," *Wyoming v. Houghton*, 526 U.S. 295, 300, 119

---

17. The employer has never expressed any concern about the police's placement of the GPS device on his van—not when he testified before the trial court and apparently not at any other time.

S.Ct. 1297, 1300, 143 L.Ed.2d 408 (1999), I believe it is unnecessary to decide this case by holding that the exclusionary rule—a remedy for a Fourth Amendment *violation*—is inapplicable in this case. *See Armstead,* 56 Va.App. at 576, 695 S.E.2d at 564.

Accordingly, I would squarely address the Fourth Amendment issue that was the subject of appellant's questions presented in this Court and that was the issue upon which the appeal was granted by this Court—the same issue that was also the focus of argument in the trial court and on which the trial court made its decision. On this Fourth Amendment issue, it is clear that the trial court committed no error. Therefore, while I agree with the majority that the trial court's conviction of appellant for abduction with intent to defile should be affirmed, I would instead do so by addressing the questions presented to, and granted by, this Court—and by holding that there was no Fourth Amendment violation under the specific facts of this particular case.

HUMPHREYS, J., concurring.

I join entirely in the analysis and judgment of the majority that we need not address the merits of the Fourth Amendment implications of the use of GPS tracking devices by law enforcement officers because, for the reasons noted by the majority, the exclusionary rule does not operate to suppress the eyewitness testimony of the police officers in this case. I write separately only to address some of the points raised by Judge Beales in Section II of his concurring opinion.

The fundamental purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Mun. Court of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *see also Skinner v. Ry. Labor Execs. Ass'n,* 489 U.S. 602, 613–14, 109 S.Ct. 1402, 1410–12, 103 L.Ed.2d 639 (1989) ("The [Fourth] Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those

acting at their direction." (citing *Camara,* 387 U.S. at 528, 87 S.Ct. at 1730)). Since 1967, the Fourth Amendment has been understood to be fundamentally concerned with protecting an individual's "privacy" from invasion and interference by the government and its agents. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). With the advent of the telephone—and the subsequent ability to tap it from the premises of a third party, the phone company—the Supreme Court recognized that the old property-centric reading of the Fourth Amendment that married the concepts of "search and seizure" to physical trespass was no longer tenable. *Id.* at 351–53, 88 S.Ct. at 511–12. Twentieth century technology had made it easy for government to intrude upon people's personal lives without intruding on their property. Consequently, the Supreme Court changed course in *Katz,* and determined that the Fourth Amendment "protects people, not places," *id.* at 351, 88 S.Ct. at 511, and substituted "reasonable expectations of privacy" for property rights as the defining element of a government "search," *id.* at 360–61, 88 S.Ct. at 516–17 (Harlan, J., concurring). Thus, under the current understanding of the Fourth Amendment, the Constitution is concerned only with government actions that violate a "reasonable expectation of privacy," which courts have held is limited to the exposure of what was previously secret and not exposed in public. *See, e.g., Carter v. Commonwealth,* 209 Va. 317, 320, 163 S.E.2d 589, 592 (1968) ("A search implies a prying into hidden places.").

Advances in technology in the twenty-first century have engendered a growing number of previously unavailable investigative and surveillance techniques—such as the GPS location tracking illustrated by this case—that allow the government to conduct what many intuitively find to be an increasingly troubling degree of monitoring of its citizens, potentially on a vast scale, by targeting information that is at least, in some sense, "public." As was the case in *United States v. Maynard,* 615 F.3d 544, 555 (D.C.Cir.2010), we are not talking about the "public" events of a single evening, but rather the comprehensive observation or electronic tracking that takes

place over a period of days, weeks, or months. While it is reasonable to expect that anyone might witness any one of such a series of public activities or events, it does not follow that one cannot reasonably expect that a particular person or group would not be privy to all of them. Similarly, one might reasonably expect something as intensely personal as their genetic profile to remain private even if such a profile could in principle be extrapolated from residual DNA left upon a glass or fork "abandoned" in a public restaurant. Thus, *Maynard* can be read to suggest that private (and thus protected) facts may be extrapolated from the aggregation of individual public events or from a technologically assisted analysis of "public" objects or information. 615 F.3d at 565–66. *Kyllo v. United States*, 533 U.S. 27, 33, 121 S.Ct. 2038, 2042, 150 L.Ed.2d 94 (2001), also supports the latter point.

However, although "privacy" is the centerpiece of current Fourth Amendment jurisprudence, the word "privacy" does not actually appear in the text of the Fourth Amendment. The constitutional protection actually promised is "security," and the time may be ripe for the courts to reconsider that term as it was used and understood by the framers of the amendment in the context of our current "Information Age" where privacy is becoming an increasingly scarce commodity. While "privacy" and "security" are overlapping concepts, they are not congruent. Granting that we as a people feel freer and more secure when our government and its agents respect our privacy, the limits of government intrusion that reasonable citizens find unacceptable are not necessarily circumscribed only by what they choose to keep private.

Perhaps the time has come that courts recognize that by its own terms, the Fourth Amendment actually stipulates that "[t]he right of the *people* to be *secure* in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . . " U.S. Const. amend. IV (emphasis added). Courts tend to abridge this phrase essentially to "the right against unreasonable searches and seizures shall not be violated." Thus, the words "people" and "secure" get lost in the editing. Nevertheless, the framers presumably

chose those words with some care and deliberation. With regard to their use of the word "people," they were certainly capable of speaking in the singular. For example, in the Fifth Amendment they provide, "No *person* shall be held to answer for a capital, or otherwise infamous crime, unless on a present-ment or indictment of a grand jury, ... nor shall any *person* be subject for the same offense to be twice put in jeopar-dy...." U.S. Const. amend. V (emphasis added). This indi-cates to me that their choice of the plural in the Fourth Amendment was deliberate. In other words, the protection afforded by the Fourth Amendment is not just concerned with how government searches and seizures affect the interests of particular individuals, but it is also concerned with those that affect the public generally. Moreover, the overall purpose of the Bill of Rights was to restrain the arbitrary and capricious use of government power. Thus, given the Fourth Amend-ment's ratification in the aftermath of a revolution largely precipitated by such abuse of governmental power, it seems obvious to me that "security" was actually a significant legal concept in the minds of the framers—something free people enjoyed in contrast to the insecurity generated by the arbi-trary exercise of government authority as experienced by the framers and their fellow colonists prior to our independence as a nation.

If we consider the increasingly ubiquitous presence of public video surveillance camera networks, the use of electronic scanners that perform a virtual "strip search" of those who make use of some forms of public transportation along with the increasing use of GPS tracking devices, whatever intuitive unease we feel about the methods employed by agents of the government has less to do with a sense that the individual "right to privacy" of any particular person has been violated than with concerns about our sense of security from govern-mental monitoring of the citizenry as a whole.

Although the Supreme Court of the United States will ultimately have the last word, "the Fourth Amendment must keep pace with the inexorable march of technological progress, or its guarantees will wither and perish." *United States v.*

*Warshak,* 631 F.3d 266, 285 (6th Cir.2010). Therefore, as the courts consider how to construe the confluence of revolutionary advances in technology with the fundamental principles embodied in the Fourth Amendment, it may be time, in cases where these issues may be more appropriately addressed than this one, for the courts to do so with the express language and the original purpose of the Fourth Amendment in mind.[18] Perhaps in addition to determining whether an individual's reasonable expectation of privacy has been violated, we might also consider whether reasonable people would remain secure in their liberties if a particular investigative or surveillance method were pervasive. If they would not, the courts should determine what restrictions—such as requiring reasonable articulable suspicion of criminal activity or a judicially authorized warrant based upon probable cause—would sufficiently narrow the method's application in a way that leaves all reasonable citizens with a realistic sense of security from arbitrary and invasive governmental monitoring of their daily activities.

---

**18.** Contrary to Judge Beales's assertion, I do not "suggest that the United States Supreme Court should overturn (or significantly alter) decades of Fourth Amendment precedent from that Court." I merely observe that as our culture continues to rapidly evolve based upon technological advances, Fourth Amendment jurisprudence must likewise continue to evolve, as it has done since the founding of the Republic, to accommodate such changes. I only suggest that as the courts participate in this evolution, as we must, we should do so with the original purpose of the Fourth Amendment in mind.